UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> v. <br> JORGE TORRES and VICTOR TORRES, <br> Defendants. | 87-Cr-593 (SHS) <br><br> OPINION & ORDER |

SIDNEY H. STEIN, U.S. District Judge.

Defendants Jorge and Victor Torres move for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). (Defs.' Mot., ECF No. 549; *see also* Defs.' Mem., ECF No. 550.) The Torres brothers—who have been incarcerated for nearly thirty-three years—request that the Court reduce their sentences of life imprisonment without the possibility of parole to time served. The government opposes this request. (Gov't Opp'n, ECF No. 554.) Because the Court finds that "extraordinary and compelling reasons" exist for such a sentence reduction, the motion is granted.

**I. BACKGROUND**

During the early 1980s, Jorge and Victor Torres[1] were involved with a large-scale, street-level heroin distribution network operating mainly out of the South Bronx. Through this conspiracy, the Torres brothers acquired large sums of cash, which they used to acquire business and real-estate holdings in Puerto Rico.

Jorge and Victor were arrested in June 1987 and charged with numerous crimes related to the heroin conspiracy. The case proceeded to jury trial, and the Torres brothers were convicted in July 1988 of, among other crimes, conspiracy to distribute heroin in violation of 21 U.S.C § 846 and conducting a continuing criminal enterprise in violation of 21 U.S.C. § 848(a) and (b). Section 848(b), sometimes called the "kingpin" provision, mandates a sentence of life imprisonment without the possibility of parole where certain conditions are satisfied. If those conditions are not satisfied, the defendant is guilty only of a violation of section 848(a), a lesser-included offense. For a section 848(a) conviction, a life-without-parole sentence is permitted but not required.

The brothers' sentencing judge, then–U.S. District Judge John M. Walker, sentenced Jorge and Victor—twenty-nine and twenty-five years old, respectively, at that time—to life imprisonment without the possibility of parole, finding that the conditions of the kingpin provision had been satisfied. On appeal, the U.S. Court of Appeals for the Second

---

[1] For clarity, the Court will refer to each brother by his given name where appropriate.

Circuit held that erroneous jury instructions had been given for the section 848(b) count. The Second Circuit therefore vacated the sentences and remanded with instructions to resentence the Torres brothers under section 848(a). *United States v. Torres*, 901 F.2d 205, 229 (2d Cir. 1990).

On remand, Judge Walker again sentenced the Torres brothers to life without parole. While he acknowledged that the brothers were "committed to trying to conduct themselves in prison in a way that [was] meaningful and consistent with their religious convictions," he ultimately concluded that "this sentence ha[d] to send a message and continue to send a message to community." (Sentencing Tr. at 25:6–11, Defs.' Mem. Ex. 9, ECF No. 550-9.) Jorge and Victor again appealed, this time arguing that their sentences constituted cruel and unusual punishment in violation of the Eighth Amendment. The Second Circuit rejected this claim and affirmed their life sentences. *United States v. Torres*, 941 F.2d 124, 128 (2d Cir. 1991).

Jorge and Victor—now sixty-three and fifty-nine, respectively—have spent over half of their lives in prison. As explained below, both have maintained an exemplary record while in prison. Despite their life-without-parole sentences, the Torres brothers have, by all accounts, made the most of the last three decades—they have enrolled, in and completed, extensive coursework, worked diligently at their respective jobs, and engaged in various community service and mentorship opportunities.

During this time, Jorge and Victor also sought various forms of postconviction relief, without success. As part of these efforts, in January 2017, the brothers petitioned the U.S. Department of Justice's Office of the Pardon Attorney for a sentence commutation. Judge Walker—now serving as a U.S. Circuit Judge on the Second Circuit—took the notable step of writing in support of the brothers' commutation petitions as follows:

> [I]n my view, the Torres' continued incarceration is not necessary to serve the needs of our criminal sentencing scheme. In more than 32 years on the bench, this is the first time that I have supported a commutation. But it is the first time that I have encountered convicted individuals whom I have sentenced that have rehabilitated themselves so completely and have rejected their criminal pasts so resoundingly.

(Walker Letters at 3, Defs.' Mem. Ex. 2, ECF No. 550-2 (citation omitted).) Despite Judge Walker's support, the brothers' commutation petitions were ultimately denied.

In December 2018, Congress enacted the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018), which opened the door for a defendant to seek a sentence reduction if "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." *Id.* § 603(b), 132 Stat. at 5239. In accordance with this process, Jorge and Victor filed a request in November 2019 with the warden of their facility, the Federal Correctional Institution in Fairton, New

Jersey (FCI Fairton). Both requests were denied. (Jorge Request at 3, Defs.' Mem. Ex. 11, ECF No. 550-11; Victor Request at 3, Defs.' Mem. Ex. 12, ECF No. 550-12.)

The Torres brothers then filed this motion for a sentence reduction with this Court, under the First Step Act's new procedure, on April 2, 2020. The government filed its opposition to the motion on April 15, 2020 (*see* Gov't Opp'n at 1), and the brothers filed a reply brief on April 20, 2020 (*see* Defs.' Reply at 1, ECF No. 555). The motion is thus fully briefed and ready for adjudication.

## II. DISCUSSION

With limited exceptions, a district court may not modify an already-imposed sentence of imprisonment. *See* 18 U.S.C. § 3582(c); *see also Freeman v. United States*, 564 U.S. 522, 526 (2011) ("Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed'; but the rule of finality is subject to a few narrow exceptions." (citation omitted) (quoting 18 U.S.C. § 3582(c))). One such exception is found at 18 U.S.C. § 3582(c)(1)(A), often called the "compassionate release" statute. As noted above, Congress amended the compassionate-release statute in 2018 to permit a defendant to request a sentence reduction on his own motion. *See* First Step Act § 603(b), 132 Stat. at 5239.

Relying on this statute, the Torres brothers argue that—given their "successful, unparalleled efforts to rehabilitate themselves, build relationships with their children and grandchildren, and give back to the prison community and community at large," as well as "the recent, unprecedented and ongoing health pandemic"—a sentence reduction under section 3582(c)(1)(A) is warranted. (Defs.' Mem. at 1.) For the reasons set forth below, the Court agrees.

### A. The Torres Brothers Have Exhausted Their Administrative Remedies

Before turning to the merits of this motion, the Court first addresses a procedural requirement.

The compassionate-release statute authorizes a district court to reduce a sentence only "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). In other words, a defendant may request compassionate release upon his own motion only if (1) he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (2) thirty days have "lapse[d] . . . from the receipt of such a request by the warden of the defendant's facility." *Id.*

3

As already noted, both Torres brothers filed requests with the warden of FCI Fairton on November 8, 2019. (Jorge Request at 1; Victor Request at 1.) Neither Jorge nor Victor received a response by December 8, 2019—that is, before thirty days had lapsed. By the plain terms of the statute, then, the Torres brothers may now file compassionate-release motions with this Court. *See* 18 U.S.C. § 3582(c)(1)(A).

The government, however, maintains that the Torres brothers' requests to FCI Fairton's warden "did not . . . address the COVID-19 pandemic"—an unsurprising fact, given that their requests were filed in November 2019, well before the declaration of the pandemic. (Gov't Opp'n at 17.) Given the fact that the pandemic was not raised in their requests to the warden, but is raised by them in their compassionate-release motions, the government contends, "[t]hey have not exhausted their administrative remedies when it comes to that aspect of their compassionate release motion" and the Court may address the motion only "on the basis of their rehabilitation." (*Id.* at 16–17.)

The government appears to be raising what is sometimes called "issue exhaustion."[2] *Sims v. Apfel*, 530 U.S. 103, 107 (2000); *see also Zhong v. U.S. Dep't of Justice*, 480 F.3d 104, 119 (2d Cir. 2007). In the government's view, before a district court may consider a compassionate-release motion, a defendant must have exhausted every *issue*—including the COVID-19 pandemic—raised in the motion. Whether issue exhaustion is required for a compassionate-release motion appears to be a question of first impression in this district.

This Court now holds that issue exhaustion is not required. To begin with, the Supreme Court has emphasized that "requirements of administrative issue exhaustion are largely creatures of statute." *Sims*, 530 U.S. at 107. And "[s]tatutory interpretation, as we always say, begins with the text." *Ross v. Blake*, 136 S. Ct. 1850, 1856, (2016). Here, there is no indication whatsoever in the statutory text that issue exhaustion is required. The compassionate-release statute requires only that a defendant "fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or for thirty days to pass after "the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A). It does not require that specific "arguments" or "claims" be raised. *Cf. Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982) (holding that issue exhaustion is required where, under the statute, "[n]o objection that has not been urged before the Board . . . shall be considered by the court" (alterations in original) (quoting 29 U.S.C. § 160(e))). Indeed, in the immigration context, the Second Circuit has interpreted similar language in 8 U.S.C. § 1252(d)(1)—which permits the "review [of] a final order of removal only if 'the alien

---

[2] The doctrine is also known as "administrative waiver" or "issue waiver," based on the notion that an issue not raised in such an administrative proceeding has been "waived." *See generally Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148 (D.C. Cir. 2005).

has exhausted all administrative remedies available to the alien as of right"—not to require issue exhaustion.[3] *Zhong*, 480 F.3d at 121 (quoting 8 U.S.C. § 1252(d)(1)). Thus, it does not appear that, "as a *statutory* matter," the compassionate-release statute requires issue exhaustion. *Id.*

Even when issue exhaustion is not mandated by statute, "it is common for an agency's regulations to require issue exhaustion in administrative appeals." *Sims*, 530 U.S. at 108. As several courts have recognized, however, the relevant Sentencing Guidelines provision for compassionate release, section 1B1.13, has not been amended following the enactment of the First Step Act, which allowed—for the first time—defendants to seek compassionate release on their own motions. *See, e.g., United States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, at *2–3 (S.D.N.Y. Apr. 14, 2020); *United States v. Lisi*, No. 15 CR. 457 (KPF), 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020); *United States v. Ebbers*, No. S402CR11443VEC, 2020 WL 91399, at *4–5, *4 n.6 (S.D.N.Y. Jan. 8, 2020). Nor has the BOP updated its regulations governing compassionate release since the Act's enactment. *See* 28 C.F.R. §§ 571.60–.64. Thus, no regulation appears to address whether issue exhaustion is required for a compassionate-release motion.

Still, courts "have imposed an issue-exhaustion requirement even in the absence of a statute or regulation." *Sims*, 530 U.S. at 108. "The basis for a judicially imposed issue-exhaustion requirement is an analogy to the rule that appellate courts will not consider arguments not raised before trial courts." *Id.* at 108–09. Given this rationale, the Supreme Court has explained, "the desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding." *Id.* at 109; *see also Zhong*, 480 F.3d at 123.

In *Sims*, a plurality[4] of Justices applied this principle to conclude that a social security claimant need not exhaust all issues in front of the Social Security Appeals Council before seeking judicial review. 530 U.S. at 111 (plurality opinion). In so concluding, the plurality gave special emphasis to the "inquisitorial rather than adversarial" nature of social-security proceedings. *Id.* As the plurality explained, the agency had the "duty to

---

[3] The Second Circuit has, however, required issue exhaustion for judicial review of immigration proceedings, based on "the strong prudential rationale for requiring all issues raised on appeal to have been presented below." *Zhong*, 480 F.3d at 123; *see also Sims*, 530 U.S. at 108–09.

[4] Justice O'Connor, who provided a fifth vote for the ultimate result, declined to join this portion of the opinion, reasoning that it was sufficient that "the regulation and procedures of the Social Security Administration (SSA) affirmatively suggest[ed] that specific issues need not be raised before the Appeals Council." *Sims*, 530 U.S. at 113 (O'Connor, J., concurring in part and concurring in the judgment). Although *Sims* plurality's reasoning is not binding, the Court still considers it to the extent it is persuasive. *See Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 463 (6th Cir. 2004).

investigate the facts and develop the arguments both for and against granting benefits" and there was "no representative . . . to oppose the claim for benefits." *Id.* Thus, the plurality reasoned, "the general rule [of issue exhaustion] makes little sense in this particular context." *Id.* (alteration in original) (quoting *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999)).

Here too, the nature of the administrative proceedings for compassionate-release requests shows that issue exhaustion is not required. "The BOP's internal administrative process is lengthy." *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *7 (S.D.N.Y. Apr. 20, 2020). After an inmate has made a request for compassionate release with the warden of his facility, the warden must investigate and evaluate the request. 28 C.F.R. § 571.62(a)(1). "If the Warden, upon an investigation of the request determines that the request warrants approval, the Warden shall refer the matter in writing with recommendation to the Office of General Counsel." *Id.* Then, if the General Counsel agrees that approval is warranted, she must "solicit the opinion of either the Medical Director or the Assistant Director, Correctional Programs Division depending upon the nature of the basis of the request," and "the opinion of the United States Attorney in the district in which the inmate was sentenced." *Id.* § 571.62(a)(2). Throughout this process, BOP officials are required to investigate and consider the merits of an inmate's compassionate-release request, with little involvement from the inmate himself. And, notably, there is no requirement that a BOP representative be assigned to oppose the inmate's request.

The conclusion that the BOP process is "inquisitorial rather than adversarial," *Sims*, 530 U.S. at 111 (plurality opinion), tracks the purpose for requiring administrative exhaustion before a compassionate-release motion. "[T]he BOP is frequently in the best position to assess, at least in the first instance, a defendant's conditions, the risk presented to the public by his release, and the adequacy of a release plan." *Russo*, 2020 WL 1862294, at *1. Given its expertise in evaluating these factors, it makes sense that the BOP "does not depend much, if at all, on claimants to identify issues for review." *Sims*, 530 U.S. at 112; *see also Scparta*, 2020 WL 1910481, at *7. The upshot is that the nature of the BOP's compassionate-release process confirms that, as in *Sims*, "a judicially created issue-exhaustion requirement is inappropriate." 530 U.S. at 111 (plurality opinion).

This conclusion is consistent with the majority of district court decisions that have addressed this question.[5] *See United States v. Brown*, No. 4:05-CR-00227-1, 2020 WL

---

[5] The Torres brothers cite *United States v. Coker*, No. 3:14-CR-085, 2020 WL 1877800, at *3 (E.D. Tenn. Apr. 15, 2020), as another case holding that issue exhaustion is not required. (Defs.' Reply at 4, ECF No. 555.) In that case, however, the district court noted that "[t]he defendant's prior application was based on emphysema, COPD, and her nearly 24 hour per day reliance on oxygen and a wheelchair." *Id.* Because the defendant relied on the pandemic only "to illustrate the increasing danger presented by the

2091802, at *4 (S.D. Iowa Apr. 29, 2020) ("[I]ssue exhaustion is inappropriate because § 3582 contains no such requirement and BOP compassionate release requests are not adversarial proceedings."); *United States v. Dillard*, No. 1:15-CR-00170-SAB, 2020 WL 2564638, at *2 (D. Idaho Apr. 27, 2020) ("The [compassionate-release] statute does not require issue exhaustion as argued by the United States and even if the Court was inclined to impose that requirement, it would be futile."). Only one district court appears to have held that issue exhaustion is required. *See United States v. Butcher*, No. 5:12CR24, 2020 WL 2610738, at *1 n.1 (N.D. Ohio May 22, 2020). There, however, the defendant "concede[d] he 'ha[d] not met the exhaustion requirement required by the statute' before seeking the Court's involvement," and the district court devoted only a brief footnote to the issue. *Id.* at *1 & n.1 (citation omitted).

In sum, the Torres brothers did not have to address the COVID-19 pandemic with the BOP before raising that issue in their compassionate-release motion. The Court may thus consider the full merits of their request, including their claim that the pandemic provides another reason for a sentence reduction.

### B. A Sentence Reduction Is Warranted

As relevant here, the compassionate-release statute provides as follows:

> [T]he court . . . may reduce the term of imprisonment . . . , after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A).

From the statutory text, three requirements for a sentence reduction under the compassionate-release statute can be derived. *See Scparta*, 2020 WL 1910481, at *8. First, the Court must "consider[] the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). Second, there must be "extraordinary and compelling reasons warrant[ing]" a sentencing reduction. *Id.* § 3582(c)(1)(A)(i). Third, "such a reduction" must be "consistent with applicable policy statements issued by the Sentencing Commission."[6] *Id.* § 3582(c)(1)(A). For the reasons set forth below, the Court concludes that the statute's requirements have most certainly been satisfied.

---

defendant's previously cited health conditions," the court reasoned, "[t]he instant motion [was] based on those very same conditions." *Id.* As a result, that court had no need to determine whether issue exhaustion was required.

[6] As discussed below, the second and third requirements are essentially the same. *See* 28 U.S.C. § 994(t).

### *1. The Section 3553(a) Sentencing Factors Favor a Sentence Reduction*

The Court begins with the sentencing factors set forth in section 3553(a). Among those factors are "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as the need for the sentence to facilitate retribution, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a)(1)–(2).

Here, given Judge Walker's role as the trial and sentencing judge for the Torres brothers and his intimate familiarity with their crimes, the Court gives considerable weight to the assessment that he made two years ago that "the goal of general deterrence is the only sentencing goal still applicable to the Torres brothers and that this goal has been met by the time of incarceration that they have served." (Walker Letters at 3 (citation omitted).) As Judge Walker explained, "Jorge and Victor were law-abiding citizens before they engaged in the serious criminal conduct proven at trial and have been model citizens ever since (even prior to incarceration)." (*Id.*) To be sure, "Jorge and Victor committed abhorrent acts for which they have neither excuse nor explanation and which merited heavy punishment." (*Id.*) In that regard, however, the Court agrees with Judge Walker that a sentence of more than three decades for each brother "is sufficient to meet the goals of criminal justice." (*Id.*)

Section 3553(a) also directs a sentencing judge to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). For this factor, the Torres brothers argue that their sentences of life without parole are "disproportionately severe compared to the sentences received by leaders of major drug trafficking organizations." (Defs.' Mem. at 42.) Since the imposition of the brothers' sentences in 1990, the brothers maintain, similarly situated defendants—"leaders of major drug trafficking organizations"—have received far lower sentences than life without parole. (*Id.* at 42–43.) They also note that their sentences appear to be "starkly disproportionate to the sentences received by their twelve co-defendants," none of whom remain incarcerated. (*Id.* at 44.) These arguments have merit. Thus, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" also appears to favor a sentence reduction. 18 U.S.C. § 3553(a)(6); *see also United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, at *15 (S.D.N.Y. Apr. 6, 2020).

Finally, the Court emphasizes that "[t]he Government does not challenge the Torres Brothers' factual narrative about rehabilitation." (Gov't Opp'n at 1.) The Supreme Court has admonished that "evidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing." *Pepper v. United States*, 562 U.S. 476, 491 (2011). As detailed below, the Torres brothers have undertaken extraordinary efforts to better themselves and their communities since their incarceration. Their remarkable postsentencing rehabilitation

8

thus confirms that the section 3553(a) sentencing factors strongly favor a significant sentence reduction.

### 2. *Extraordinary and Compelling Reasons Exist for a Sentence Reduction*

The compassionate-release statute does not provide a definition of "extraordinary and compelling reasons." Instead, Congress directed that "[t]he [U.S. Sentencing] Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). In other words, Congress delegated to the Sentencing Commission to define "extraordinary and compelling reasons" in its "general policy statements." *Id.* In defining what constitutes "extraordinary and compelling reasons," the Sentencing Commission was limited in only one respect—Congress instructed that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." *Id.*

The practical effect of 28 U.S.C. § 994(t) is that the last two conditions of the compassionate-release statute—that "exceptional and compelling reasons" exist for a sentence reduction and that "such a reduction" be "consistent with applicable policy statements issued by the Sentencing Commission," 18 U.S.C. § 3582(c)(1)(A)—collapse into a single requirement. The Court will thus consider those conditions together.

The relevant policy statement governing compassionate release is found at section 1B1.13 of the Sentencing Guidelines. The text of section 1B1.13 itself does not define "extraordinary and compelling reasons." Instead, section 1B1.13 essentially restates the requirements of the compassionate-release statute, adding only that a sentence reduction is warranted only if "[t]he defendant is not a danger to the safety of any other person or to the community." U.S. Sentencing Guidelines Manual § 1B1.13(2) (U.S. Sentencing Comm'n 2018) [hereinafter U.S.S.G.].[7]

The provision's commentary, however, offers more guidance. It provides three specific circumstances under which "extraordinary and compelling reasons exist":

1. when the defendant's medical condition, such as a "terminal illness" or "a serious physical or medical condition," justifies a sentence reduction;

2. when "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment"; and

---

[7] Here, the government does not dispute that the Torres brothers are not a danger to any person or the community.

3. when the defendant's family circumstances, such as "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children," support a sentence reduction.

*Id.* § 1B1.13 cmt. 1(A)–(C).

Even where these circumstances are not present, the Guidelines' commentary also contemplates that extraordinary and compelling reasons may exist if, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described." *Id.* § 1B1.13 cmt. 1(D). Finally, the commentary emphasizes that, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, *by itself*, an extraordinary and compelling reason for purposes of this policy statement." *Id.* § 1B1.13 cmt. 3 (emphasis added).

Here, the Torres brothers do not contend that any of the three circumstances enumerated in section 1B1.13's commentary apply. Instead, they argue, the First Step Act empowered district courts "to reduce prison terms on the full array of grounds reasonably encompassed by the phrase 'extraordinary and compelling reasons.'" (Defs.' Mem. at 18.) Thus, in their view, the Court may—and should—consider the totality of the brothers' circumstances in considering whether extraordinary and compelling reasons exist. (*See id.*)

The Court agrees. As already noted, section 1B1.13 has not been amended since the enactment of the First Step Act. But given the new compassionate-release authority provided by the Act, "the majority of district courts to consider the question have found that the amendments made to 18 U.S.C. § 3582(c)(1)(A) grant this Court the same discretion as that previously give[n] to the BOP Director, and therefore the Court may independently evaluate whether [a defendant] has raised an extraordinary and compelling reason for compassionate release." *Lisi*, 2020 WL 881994, at *3. The upshot is that, under the First Step Act's amendments, a district court may find "extraordinary and compelling reasons" beyond the examples listed in section 1B1.13's commentary and such a finding remains "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

Exercising this authority, the Court finds that Jorge and Victor have established extraordinary and compelling reasons for a sentence reduction. Three reasons bear emphasis.

First, the Torres brothers are indeed "fully and unconditionally rehabilitated." (Defs.' Mem. at 22.) On this point, Judge Walker put it best: "In more than 32 years on the bench, this is the first time that I have supported a commutation. But it is the first time that I have encountered convicted individuals whom I have sentenced that have rehabilitated

10

themselves so completely and have rejected their criminal pasts so resoundingly." (Walker Letters at 4.)

In response, the government contends that "directives from Congress, the Sentencing Commission, and the courts bar the Torres Brothers' rehabilitation argument as a matter of law, regardless of their rehabilitative achievements." (Gov't Opp'n at 13.) The government is incorrect. True enough, Congress has provided that "rehabilitation of the defendant *alone* shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t) (emphasis added); *see also* U.S.S.G. § 1B1.13 cmt. 3. As Judge Preska recently recognized, however, "legislators' use of the modifier 'alone' evidences that they believed that rehabilitation *is relevant* to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute 'extraordinary and compelling reasons' for a sentence reduction." *Millan*, 2020 WL 1674058, at *7. Indeed, failure to give effect to the word "alone" would "run[] afoul of the 'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute.'" *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)); *see also* Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 174–79 (2012). For that reason, several courts have recognized that "rehabilitation in combination with the other factors" can "constitute, in their entirety, . . . extraordinary and compelling reasons." *United States v. Cantu-Rivera*, No. CR H-89-204, 2019 WL 2578272, at *2 n.2 (S.D. Tex. June 24, 2019); *see also United States v. Almontes*, No. 3:05-CR-58 (SRU), 2020 WL 1812713, at *8 (D. Conn. Apr. 9, 2020); *Millan*, 2020 WL 1674058, at *10; *United States v. Walker*, No. 1:11 CR 270, 2019 WL 5268752, at *3 (N.D. Ohio Oct. 17, 2019).

The government cites several cases purporting to confirm that rehabilitation cannot be considered—at all—in a compassionate-release motion. (Gov't Opp'n at 13–15.) All of those cases, however, simply restate the limitation already found in the text—that, for purposes of compassionate release, "rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t); *see also, e.g.*, *United States v. Wieber*, No. 3:14-CR-74-TBR, 2020 WL 1492907, at *3 (W.D. Ky. Mar. 27, 2020) ("[S]ince the passage of the First Step Act, district courts around the country have continued to deny motions for release based *solely* on the rehabilitation of the defendant." (emphasis added)); *United States v. Brown*, 411 F. Supp. 3d 446, 452 (S.D. Iowa 2019) ("The Court considers—and applauds—Defendant's conduct, but it cannot release him on these grounds *alone* under § 3582(c)." (emphasis added)). Those cases do not address whether rehabilitation could, "in combination with the other factors," justify a compassionate-release request. *Cantu-Rivera*, 2019 WL 2578272, at *2 n.2.

The Court recognizes that a court in this district apparently declined to factor in rehabilitation as part of a defendant's compassionate-release request. *Lisi*, 2020 WL 881994, at *4. There, however, Judge Failla ultimately concluded that the defendant's

11

"present health condition meets the standard of being an extraordinary and compelling reason for reduction in sentence." *Id.* Thus, she had no need to consider—as the Court does here—whether rehabilitation is relevant as part of the totality of the circumstances. Given the clarity of the statutory text, the Court holds that rehabilitation is relevant to whether there are extraordinary and compelling reasons for a sentence reduction. *See Millan*, 2020 WL 1674058, at *15.

To that end, the Court again notes that "[t]he Government does not challenge the Torres Brothers' factual narrative about rehabilitation." (Gov't Opp'n at 1.) Nor could it. The Torres brothers' exemplary records speak for themselves. Remarkably, in over three decades of incarceration, the brothers have each received only a single disciplinary infraction—apparently issued "for a messy cell during a time when the space was being renovated." (Defs.' Mem. at 22.) Both Jorge and Victor have steadily maintained employment with UNICOR, the federal prison system's work program, earning stellar reviews. (*Id.* at 28–29; *see also, e.g.,* Jorge Work Record at 1, Defs.' Mem. Ex. 16, ECF No. 550-16.)

During their incarceration, the brothers have also "completed a plethora of courses, educational programs, and life skills programs at the prisons." (Defs.' Mem. at 22.) Victor has obtained a Bachelor of Science degree in Management from Park College in Parkville, Missouri, graduating magna cum laude. (*Id.* at 25) Both brothers have been training as dental lab technicians. (*Id.*) And their BOP records show the completion of courses across a broad array of professional and life skills, including accounting, electrical work, plumbing, parenting, and political science. (Jorge Reentry Plan at 1–2, Defs.' Mem. Ex. 7, ECF No. 550-7; Victor Reentry Plan at 1–2, Defs.' Mem. Ex. 8, ECF No. 550-8.)

Notably, the chief psychologist at FCI Fairton, Dr. Brian Redondo, has expressed great confidence in the Torres brothers' rehabilitation. In his view, "[f]rom the outset, they have demonstrated acceptance for their crimes and have expressed remorse, and most importantly, have maintained a positive attitude, strong work ethic, and commitment to personal growth, in the absence of tangible hope for a release from prison." (Redondo Letter at 2, Defs.' Mem. Ex. 15, ECF No. 550-15.) Given the Torreses' records, he concluded:

> Based on my observations, I have a high degree of confidence in their ability to succeed outside of a controlled environment, as their growth spans various areas: psychological, spiritual, employment, education, etc. They have demonstrated sustained, exemplary behavior for close to 30 years and there is no reason to believe their actions would not translate outside of the correctional setting.

(*Id.*)

The Court agrees with Dr. Redondo and concludes that the Torres brothers' strong and sustained rehabilitation contributes to finding "extraordinary and compelling reasons" for reducing their sentences. 18 U.S.C. § 3582(c)(1)(A).

Second, Jorge and Victor have—even while incarcerated—made substantial contributions to their communities, and they have shown a commitment to public service if they are released. As Judge Walker recognized, "[i]t is difficult to overstate, and it would be improper to ignore, the lengthy list of Jorge and Victor's good deeds." (Walker Letters at 3.)

In large part because of their exemplary conduct while incarcerated, both Jorge and Victor were selected to serve as inmate facilitators in the BOP's Reaching Out to Provide Enlightenment (ROPE) program, which was designed to deter high-risk youth "from lifestyles that may lead to incarceration." (Defs.' Mem. at 29.) As inmate facilitators, they provided education and mentorship to ROPE's youth by "describ[ing] their background, how they came to be involved in selling drugs, their criminal conduct, and their regrets." (*Id.* at 30.) According to Dr. Redondo, during their six years of ROPE service, Jorge and Victor "participated in presentations to approximately 10,000 juveniles, college students, group homes, churches, etc." (Redondo Letter at 1.)

On a more unofficial basis, Jorge and Victor are recognized as mentors for their fellow FCI Fairton inmates. As one BOP counselor at the prison, Michael Coard, explained, "Jorge and Victor have always tried to influence and mentor younger inmates so they could have positive role models to look to for advice and leadership." (Jorge BOP Support Letters at 4, Ex. 13, ECF No. 550-13; Victor BOP Support Letters at 4, Ex. 14, ECF No. 550-14; *see also* Redondo Letter at 1 ("Beyond their programming activities, the Torres brothers routinely provide mentorship to first time offenders within the prison environment in an effort to assist them in avoiding involvement in destructive activities.").) Similarly, a former FCI Fairton inmate, Ramon Nicolai, wrote that Jorge and Victor "were positive role models for [him]self and any man who comes in in contact of them," offering mentorship "through genuine thoughtfulness and caring." (Jorge Family Support Letters at 25, Defs.' Mem. Ex. 5, ECF No. 550–5; Victor Family Support Letters at 25, Defs.' Mem. Ex. 6, ECF No. 550–6.)

The Torres brothers are also viewed as religious leaders at FCI Fairton. Jorge serves as the prison chapel's inmate pastor for the Spanish congregation, while Victor served as an usher for the Spanish congregation for several years and continues to lead Bible study sessions. (Defs.' Mem. at 24.) FCI Fairton's prison chaplain, Daniel Cho, confirms the brothers' religious service, noting that Jorge "always serves the Lord with a faithful heart and has served as a lay minister for the past 28 years in the Prison Chapel" and that Victor "served as a Suicide Companionship mentor for the last ten years" and "is a changed and wonderful man, a great minister, and a wonderful father." (Jorge BOP Support Letters at 6; Victor BOP Support Letters at 6.)

13

What is more, the Torres brothers have shown a commitment to further community service if they are released. Owing to their positive experiences in the BOP's ROPE program, Jorge and Victor have expressed a desire to create a nonprofit organization modeled after ROPE, which they call "Presenting Opportunity While Embracing Restoration"(POWER). (Defs.' Mem. at 31–32.) The brothers have already produced a sample brochure for POWER, which explains that "[t]his program is presented by ex-convicts and people who have experienced the heavy toll of negative lifestyles." (POWER Brochure at 2, Defs.' Mem. Ex. 19, ECF No. 550-19.) According to the materials, POWER participants will "use presentations and skits to demonstrate to juveniles the consequences of the bad and destructive decisions in [their] lives and the pain caused to [their] loved ones (family) and [them]selves." (*Id.*)

Contrary to the government's arguments, these acts do not amount to further arguments based on rehabilitation. By any measure, the Torres brothers' good deeds exceed the bounds of what we consider "rehabilitation." This conclusion is confirmed by the statutory text. When, as here, "a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). In ordinary parlance, "rehabilitation" is defined as "[t]he process of seeking to improve a criminal's character and outlook so that he or she can function in society without committing other crimes." *Rehabilitation*, *Black's Law Dictionary* (11th ed. 2019); *see also Rehabilitation*, *Webster's Third New International Dictionary* (2002) ("[T]he process of restoring an individual . . . to a useful and constructive place in society . . . ."); *Rehabilitation*, *Oxford English Dictionary* (2d ed. 1989) ("Improvement of the character, skills, and behaviour of an offender . . . in order to aid reintegration into society."). In other words, the ordinary meaning of "rehabilitation" is a change in a defendant's circumstances that leads to a return to society with no further criminal activity.

Under this definition, rehabilitation is not uncommon. Many defendants who pass through this Court ultimately become fully functioning members of society—they achieve, so to speak, rehabilitation. In fact, many federal defendants who return to society do not commit more crimes. In a 2016 study, the U.S. Sentencing Commission found that over two-thirds of federal offenders released in 2005—68.3% of 25,431 individuals—were not ultimately convicted of another offense. Kim Steven Hunt & Robert Dumville, U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* 5 (2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf. Although that number is far from ideal, it still shows that—at least within the ordinary meaning of the term—some measure of "rehabilitation" is attainable for many defendants.

Here, by comparison, the Torres brothers have established a decades-long record of meaningful community service, a record that would be notable even outside the federal prison system. As Judge Walker aptly stated: "Jorge and Victor's sustained and successful

efforts to improve themselves, their families, and their community are commendable, and, in my experience, unique." (Walker Letters at 4.) The Court concludes that the Torres brothers' contributions are, as the statute requires, "extraordinary and compelling." 18 U.S.C. § 3582(c)(1)(A)(i).

Third and finally, although the Torres brothers would likely merit a sentence reduction under normal circumstances, the ongoing COVID-19 pandemic provides yet another reason for their release. It is received wisdom at this time that COVID-19 is highly contagious, spreading through respiratory droplets of those infected, and even asymptomatic individuals can spread the virus to others. Brian Resnick, *12 Things Everyone Needs to Know About the Coronavirus Pandemic*, Vox (Apr. 2, 2020, 12:00 PM), https://www.vox.com/science-and-health/2020/4/2/21197617/coronavirus-pandemic-covid-19-death-rate-transmission-risk-factors-lockdowns-social-distancing. Although the exact deadliness of the disease is still in flux, early indications are that COVID-19 is far deadlier than the seasonal flu. *See id.*

Given these circumstances, there can be no question that—as several judges in this district have recognized—"the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals." *Scparta*, 2020 WL 1910481, at *9; *accord United States v. Nkanga*, No. 18-CR-713 (JMF), 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020); *United States v. McKenzie*, No. 18 CR. 834 (PAE), 2020 WL 1503669, at *3 (S.D.N.Y. Mar. 30, 2020). And, as the Centers for Disease Control and Prevention (CDC) has recognized, "older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19." *People Who Are at Higher Risk for Severe Illness*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last updated Apr. 2, 2020) (emphasis omitted). Among those considered by the CDC to be high risk are individuals older than sixty-five and those with underlying health conditions, including heart conditions and diabetes.

Here, both Jorge and Victor—who are currently sixty-three and fifty-nine, respectively—are on the cusp of the high-risk age group. Jorge, in particular, suffered a stroke in 2018 and currently suffers from high blood pressure and and diabetes, two conditions that place him at a greater risk of severe illness from COVID-19. ((Defs.' Mem. at 38.) Victor, who suffers from arthritis and gallbladder stones, is only slightly better off. (*Id.*) Their age and health do weigh in favor a sentence reduction, given the ongoing pandemic.

And there is a good argument that, "[r]ealistically, the best—perhaps the only—way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible." *Nkanga*, 2020 WL 1529535, at *1. Indeed, the Attorney General has supported "prioritizing the use of home confinement as a tool for combatting the dangers that COVID-19 poses." Memorandum from William

Barr, Att'y Gen., to Dir., Bureau of Prisons 1 (Apr. 3, 2020), https://www.justice.gov/file/1266661/download.

In sum, the Court holds that the totality of the Torres brothers' circumstances—their thorough and long-term rehabilitation, exemplary community service, and the high risk presented by the COVID-19 pandemic—provides "extraordinary and compelling reasons" for a sentence reduction. Thus, the Court finds that the statutory criteria for a sentence reduction are satisfied and that a sentence reduction is warranted.

### III. CONCLUSION

For the reasons stated above, the Court GRANTS Jorge and Victor Torres's motion for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). The Court resentences Jorge and Victor Torres to time served.

It is FURTHER ORDERED that the parties shall meet and confer and submit a proposed order governing the conditions of defendants' release no later than June 4, 2020, at 12:00 p.m.

Dated: New York, New York
      June 1, 2020

SO ORDERED

_____
SIDNEY H. STEIN
U.S.D.J.